Eric B. Hull (# 291167)
ebh@kfcfirm.com
KERCSMAR FELTUS & COLLINS PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90211
Telephone: (310) 928-7885
Facsimile: (480) 421-1002

Sean J. O'Hara *(Admitted Pro Hac Vice)*
sjo@kfcfirm.com
KERCSMAR FELTUS & COLLINS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002

*Attorneys for KandyPens Inc.*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| Kandypens, Inc., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>Puff Corp., a Delaware corporation,<br><br>Defendant. | Case No. 2:20-cv-00358-GW-KS<br><br>**KANDYPENS, INC.'S NOTICE OF MOTION TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY FROM EXPERT RICHARD MEYST AND MEMORANDUM IN SUPPORT** |
| Puff Corp., a Delaware corporation,<br><br>Counterclaimant,<br><br>v.<br><br>Kandypens, Inc., a Delaware corporation,<br><br>Counterdefendant. | District Judge: George H. Wu<br>Date: October 7, 2021<br>Time: 8:30 a.m.<br>Place: Courtroom 9D, Ninth Floor<br>350 West 1st Street<br>Los Angeles, CA 90012<br>Action Filed: January 13, 2020<br>Trial Date: December 14, 2021 |

*Kercsmar Feltus & Collins PLLC*
*8200 Wilshire Boulevard, Suite 222*
*Beverly Hills, California 90401*
*(310) 928-7885*

Kerosmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** on October 7, 2021 at 8:30 a.m. in Courtroom 9D of the above-captioned courthouse located at 350 West 1st Street, Los Angeles, California 90012, the Honorable Judge George H. Wu presiding, Plaintiff and Counterdefendant KandyPens, Inc. ("KandyPens") will, and hereby does, move the Court pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) to exclude numerous opinions stated in the Expert Report of Richard Meyst, dated June 4, 2021 ("the Meyst Report"), and any testimony related to those opinions. The Meyst Report is attached to the O'Hara Declaration as Exhibit A.

Meyst's opinion regarding the alleged presence of "second container outlets" in the KandyPens Oura should be excluded as conclusory and unreliable—he concedes that the alleged second container outlets are not actually outlets at all—and because he invades the province of the jury to interpret the testimony of other witnesses in order to reach his opinions. When questioned about the basis for his opinions, he made it clear that his opinions are conclusory with no support.

Meyst's opinion regarding infringement should be excluded as unreliable because he improperly compares the Oura to alleged commercial embodiments and other alleged infringing articles rather than to the patent claims themselves. Similarly, he invades the province of the jury by comparing the Oura directly to the Peak in order to identify similarities and inferring that direct copying occurred. The jury is capable of make that determination for itself, and it's unclear what assistance Meyst's expertise provides in that endeavor.

Finally, Meyst's opinions are based on a description of a person of ordinary skill in the art ("POSITA") that wholly lacks foundation. Instead, it seems based on the qualifications of a single Puffco employee while Meyst concedes he has no

knowledge of that employee's qualifications at the time he led the development of the Peak, nor does he have knowledge of the qualifications of any other worker in the field.

This motion is made following the conference of counsel pursuant to L.R. 7-3, which took place telephonically on August 11, 2021.

This motion is based on this Notice of Motion and Memorandum of Points and Authorities, the exhibits hereto, the accompanying Proposed Judgment, the pleadings and papers in this action, and on such other evidence and argument as may be presented at the hearing.

DATED this 18th day of August 2021,

KERCSMAR FELTUS & COLLINS PLLC

By: *s/ Sean J. O'Hara*
    Sean J. O'Hara
    7150 East Camelback, Suite 285
    Phoenix, Arizona 85251

    Eric B. Hull
    100 Wilshire Boulevard, Seventh Floor
    Santa Monica, California 90401

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION ............................................................................. 2

II. FACTUAL BACKGORUND ......................................................... 2

   A.  Meyst's Comparison of the Peak to the Oura ......................... 3

   B.  Meyst's Opinion regarding the "Second Container Outlets" ............... 4

   C.  Meyst's Opinions on a Person of Ordinary Skill in the Art
      ("POSITA") ........................................................................ 7

III. ARGUMENT ................................................................................ 8

   A.  The Daubert Standard .......................................................... 8

   B.  Meyst's Infringement Opinions Are Conclusory and Not Based on
      Sufficient Facts or Data ...................................................... 10

   C.  Meyst's Second Container Outlet Opinion Lacks a Sufficient Factual
      Foundation ......................................................................... 11

   D.  Meyst Improperly Compares the Oura to the Peak Rather than the
      Patent .............................................................................. 12

   E.  Meyst Invades the Province of the Jury .............................. 14

   F.  Meyst's Opinions Regarding a Posita Are Unreliable ............ 15

IV. CONCLUSION ............................................................................ 16

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

# TABLE OF AUTHORITIES

**Cases** Page(s)

*cxLoyalty, Inc. v. Maritz Holdings Inc.*,
  986 F.3d 1367 (Fed. Cir. 2021) .......................................................................10, 11

*Daubert v. Merrell Dow Pharm., Inc.*,
  43 F.3d 1311 (9th Cir. 1995) ....................................................................................9

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993)........................................................................................ Passim

*Domingo v. T.K.*,
  289 F.3d 600 (9th Cir. 2002) ....................................................................................9

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
  312 F. Supp. 3d 830 (C.D. Cal. 2018) ................................................................12, 13

*Fontem Ventures, B.V. v. NJOY, Inc.*,
  14-1645-GW(MRWX), 2015 WL 12720306 (C.D. Cal. Oct. 22, 2015) ...............11

*Junker v. Med. Components, Inc.*,
  2019 WL 109385 (E.D. Pa. Jan. 4, 2019)...............................................................11

*Loctite Corp. v. Ultraseal Ltd.*,
  781 F.2d 861 (Fed. Cir. 1985) .................................................................................12

*Lust v. Merrell Dow Pharm., Inc.*,
  89 F.3d 594 (9th Cir. 1996) ......................................................................................9

*MobileMedia Ideas LLC v. Apple Inc.*,
  780 F.3d 1159 (Fed. Cir. 2015) ...............................................................................10

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
  378 F.3d 1396 (Fed. Cir. 2004) ...............................................................................12

*SRI Int'l v. Matsushita Elec. Corp.*,
  775 F.2d 1107 (Fed. Cir. 1985) .........................................................................12, 14

*Sundance, Inc. v. DeMonte Fabricating Ltd.*,
  550 F.3d 1356 (Fed. Cir. 2008) ...........................................................................9, 14

*Tektronix, Inc. v. United States*,
  179 U.S.P.Q. 703 (Ct. Cl. 1973) ..............................................................................12

*Teledyne McCormick Selph v. United States*,
  558 F.2d 1000 (Ct. Cl. 1977)...................................................................................12

*TQ Delta, LLC v. CISCO Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ...............................................................................10

**Rules**

Fed. R. Evid. 702 ..........................................................................................8, 9, 16

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Keesmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.     INTRODUCTION

Puffco disclosed Richard Meyst as its expert on the issue of "Kandypens, Inc.'s Infringement Of U.S. Patent No. 10,517,334[.]" But as his Report and deposition testimony made clear, Meyst relied largely on his own subjective conclusions, unattached to the facts in the case or this Court's claim construction ruling. Where he did rely on facts, he invaded the province of the jury, relying on inferences and his own interpretation of facts that the jury will be charged with deciding at trial. Confusingly, regarding the crucial issue of whether the Oura has "second container outlets," Meyst agrees that gas leaves the container before passing through the "outlets"—directly contradicting this Court's construction that "second container outlets" must actually be outlets, i.e., "apertures or openings through which gas leaves the container." And yet, he persists in opining that KandyPens' Oura infringes the patents based on those same openings being "second container outlets." Further, Meyst advances an opinion of a person of ordinary skill in the art based solely on one Puffco employee—while admitting he is not aware of the qualifications of other relevant people, or even that one employee's qualifications when he led development of the Peak.

Meyst's opinions on these subjects are unreliable and should be excluded from the case.

### II.    FACTUAL BACKGROUND

On June 4, 2021, Puffco disclosed Meyst as an expert on the issue of Kandypens, Inc.'s infringement of U.S. Patent No. 10,517,334. Included with this disclosure was a report from Meyst dated June 4, 2021, a copy of Meyst's CV, and a copy of Meyst's fee schedule. (Puff Corp.'s Disclosure of Richard Meyst as Expert Witness Pursuant to FRCP Rule 26(a)(2), attached as Ex. A to the O'Hara Decl.)

1

2

### A.   Meyst's Comparison of the Peak to the Oura

3 In the Report, Meyst makes the conclusory statement: "The Kandypens'

4 Oura and the Puffco Peak operate in the same fashion." (Meyst Report ¶36.) But at

5 his deposition, Meyst made it clear that this statement has no reliable foundation.

6 When asked if he performed any experiments in this matter, he answered, "I turned

7 the units on. I looked at the Quick Start guides which explain how to operate them,

8 so I did that. Never put anything to vaporize in it." (R. Meyst Dep. (7/20/21) at

9 31:13-18, attached as Ex. B to the O'Hara Decl.)

10 Instead, he testified that he compared the Oura not to the '334 Patent, but to

11 the Peak itself. (R. Meyst Dep. (7/20/21) at 67:25-69:21.) He claims to have done

12 so "because the Peak practices all of the elements of the claims and the Peak

13 appears to me to be the predecessor of the Kandypens product. The Kandypens

14 product, as discussed in my report, was a copy." (*Id.*) He admits that this conclusion

15 is not based on his expert analysis, but based on facts in the case: "And, in fact, I

16 believe a Peak device was shipped to a manufacturer in China and said, this is what

17 we are doing with the additional changes." (*Id.*; *see also id.* at 115:16-116:15.)

18 When asked why comparing the Oura to the Peak helps his analysis of

19 infringement and whether the Oura embodies the Patent's claims, he answered:

20 > Well, the Peak product was copied. They're very similar. There
21 > are aspects that are different which are not involved in claims, but
> it helped me understand the operation and function of the Peak
22 > product in the way the thing works, in general, allows me to
> compare it to the Kandypens product and the Kandypens product
23 > matches up on every case.

24 (*Id.*) Summing up his attitude towards his engagement, he defended this choice by

25 declaring: "I don't think there is anything wrong with doing that. I'm entitled to do

26 whatever I want." (*Id.*)

27

28

Kersmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

1

2

### B.   Meyst's Opinion regarding the "Second Container Outlets"

3   In his Report, Meyst declares: "The second container outlets of the Oura are

4   designed exactly as described in one embodiment of the '334 Patent . . . ." (Meyst

5   Report ¶89; *see also id.* ¶49.) In describing the alleged "second container outlets of

6   the Oura," he states, "The Oura device allows for the flow of gas through the device

7   and atomizer, including the flow into the container through the first container inlet,

8   flow out of the container through the second container outlets, and flow through the

9   internal atomizer gas flow path." (Meyst Report ¶153; *see also id.* ¶152 ("The

10   atomizer of the Oura device includes a first container inlet that a flow of gas flows

11   through into at a top of the container, and second container outlets through which

12   the gas flows out of the container, and that are separate from the inlet and disposed

13   towards a top end of the atomizer"); *id.* ¶154 ("The internal atomizer gas flow path

14   of the Oura device receives the gas from the second container outlets and is formed

15   in a passage between walls of the container and the atomizer housing, with the

16   atomizer housing comprising apertures to flow gas from the internal atomizer gas

17   flow path to an airtight passage external to the atomizer").) In another part of the

18   Report, he states, "The second container outlets include outlet slots formed by the

19   gap between the top surface of the container and the recesses in the metallic circular

20   ring (Oura device) or the ceramic circular ring (Peak device)." (Meyst Report ¶38;

21   *see also id.* ¶37.)

22   When asked to differentiate this bald conclusion from the work done by

23   Kandypens' expert, Dr. Colwell, who concluded that the Oura has no "second

24   container outlets" under the Court's construction of that term, Meyst admitted he

25   only "skimmed" Dr. Colwell's report. (R. Meyst Dep. (7/20/21) at 75:8-15.) He

26   then testified, "I see what he says. I think it's clear in my report that I say that the

27   Kandypens product does have second container outlets." (*Id.*) When asked why he

28

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

4

reached that conclusion, he curtly answered: "Because it does." (*Id*.; *see also id*. at 81:1-19 ("Well, this is my opinion. . . . And I believe this is a fact of how the thing operates.").)

But later in his deposition, Meyst agreed that what he refers to as "second container outlets of the Oura" are not actually the apertures or openings through which gas leaves the container; instead, gas leaves the container through the same opening it entered (what both parties agree is the "first container inlet"). Instead, he agrees with KandyPens' expert Dr. Colwell that gas is fully out of the container before it enters the "slits" in the ring above the container.



Figure 6        Sketch of gas flow path through the KandyPens Oura atomizer.

*Figure 6 from Dr. Colwell's Report, showing that gas cannot enter the slits without first leaving the container through the container's sole opening.*[1]

[1] Dr. Colwell's Report is Exhibit 108 to the Meyst Deposition, attached as Ex. B to the O'Hara Decl. Figure 6 is on page 10 of the Report.

5

Keresmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885



*Exhibit 109 to Meyst's Deposition is a diagram drawn by Meyst and KandyPens' counsel during the deposition. Meyst agrees that gas within the box labeled "1" has already left the container.*

> Q. Gas that is started at the -- started from the bottom of the container and then is reached where that box is, the box labeled one, you agree with me that that box -- that gas has already left the container; correct?
>
> A. I think we said that before, yes.
>
> Q. Okay. And then after that it then goes through the slit?
>
> A. Okay.

(R. Meyst Dep. (7/20/21) at 98:16-24; *see also id.* at 85:15-86:24; 100:2-17.)

In sum, Meyst proposes to testify that the Oura's slits are "second container outlets" despite acknowledging that they do not fit the construction of "second container outlet" issued by the Court. Such testimony is unreliable and irrelevant, and should be excluded.

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Keesmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

### C.   Meyst's Opinions on a Person of Ordinary Skill in the Art ("POSITA")

In the Report, Meyst opines on the level of education and experience of a POSITA:

> It is my opinion that a person of ordinary skill in the art at the time of the inventions of the '334 Patent would have at least an associate's degree in engineering or physics or the equivalent, and at least five years of experience with vaporizing devices. Alternatively, more education, such as a Bachelor of Science degree in Mechanical Engineering, Electrical Engineering or Industrial Design or related fields could reduce the number of years of experience to at least one to three years of experience.

(Meyst Report ¶18.)

When asked how he arrived at the conclusions in this paragraph, he answered:

> Well, I looked at the -- the general technology. I looked at the patents. I looked at the products and ***this is based on my general feeling*** that this is not someone who is a super expert. A person of skill in the art, ordinary skill in the art is someone who might work in industry on this kind of a product.

(R. Meyst Dep. (7/20/21) at 34:5-13 (emphasis added).) He added that the technology in question is "pretty basic." (*Id*. at 36:16-23.)

His knowledge regarding the necessary background for a POSITA focused mainly on one Puffco employee: "Well, my knowledge is limited, but I understand that the gentleman at Puffco, which is who I have at least been aware of, he was -- had a design or bachelor's degree, I believe, in industrial design and has been working in the field for a number of years." (*Id*. at 40:3-16.) He could not remember the man's name but agreed when asked about Avi Bajpai. (*Id*.) Meyst did not know that Bajpai had only one year of experience working with portable electronic vaporizers when he worked on the Peak, and that despite having no experience with portable electronic vaporizers before he was hired by Puffco, he

7

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

was hired as "lead engineer" who managed to bring a vaporizer to market just three months later. (*Compare id.* at 54:1-12 *with* A. Bajpai Dep. (7/21/21) at 11:13-14:10, 20:2-21:17, attached as Ex. C to the O'Hara Decl.) He is similarly ignorant of Roger Volodarsky's educational background (which does not include any engineering degrees), even though he considers Volodarsky to have "knowledge above and beyond an ordinary skill." (*Id.* at 43:23-44:21.)

Curiously, under Meyst's own definition, Meyst himself would not be a POSITA. When asked whether someone who has experience only in e-cigarettes could be a person of ordinary skill in the art as it relates to products like the Peak or the Oura, he answered: "I think they would require some experience . . . in the product that you're working on." (*Id*. at 60:2-10.) Meyst has no such experience, and relies only on his previous litigation consulting work for Fontem Ventures as his "experience with vaporizers." (*Id.* at 52:11-20.)

Furthermore, Meyst provided a different definition of a POSITA in this case than he had as an expert for an e-cigarette case several years prior. He could not explain the difference: "Well, I think it's an opinion that you develop and it may change over time. It's not an absolute, so this is an approximation of what would be required and very -- very well the same person could look at the same information and come up with a different result." (*Id*. at 61:6-15.) In fact, on the differences in his opinion, he conceded, "I hadn't thought about it." (*Id*. at 62:20-63:6.)

## III.   ARGUMENT

### A.   The *Daubert* Standard

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert opinion testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon

8

sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

In *Daubert v. Merrell Dow Pharm., Inc.*, the Supreme Court charged trial courts with acting as "gatekeepers" to ensure all expert testimony "is not only relevant, but reliable." 509 U.S. 579, 589 (1993). The Court held, "the word 'knowledge' connotes ***more than subjective belief or unsupported speculation***. . . . Proposed testimony must be supported by appropriate validation—i.e., 'good grounds,' based on what is known. In short, the requirement that an expert's testimony pertain to 'scientific knowledge' establishes a standard of evidentiary reliability." *Id*. at 590 (emphasis added). In *Kumho Tire Co. v. Carmichael*, the Supreme Court confirmed that expert testimony "requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility. And where such testimony's factual basis, data, principles, methods, or their application are called sufficiently into question . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of the relevant discipline." *Id*. at 149 (internal quotations and citations omitted).

The proponent of expert testimony has the burden of establishing the expert is qualified to opine on the proffered issues, and that his opinions are relevant to the case and meet the requirements for reliability. *See Lust v. Merrell Dow Pharm., Inc.*, 89 F.3d 594, 598 (9th Cir. 1996). "The court, in its role as gatekeeper, must exclude expert testimony that is not reliable and not specialized, and which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions." *Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2008).

Furthermore, and key to the analysis here, an expert's opinion must have a foundation "based upon sufficient facts or data," as required by Rule 702. *See Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (quoting *Daubert v. Merrell*

9

Keresmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

1   *Dow Pharm., Inc.*, 43 F.3d 1311, 1317–18 (9th Cir. 1995). And courts will "not

2   accord weight to conclusory expert testimony." *cxLoyalty, Inc. v. Maritz Holdings*

3   *Inc.*, 986 F.3d 1367, 1378 (Fed. Cir. 2021); *see also TQ Delta, LLC v. CISCO Sys.,*

4   *Inc.*, 942 F.3d 1352, 1358–59 (Fed. Cir. 2019) (collecting cases); *MobileMedia*

5   *Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1172 (Fed. Cir. 2015) ("Conclusory

6   statements by an expert ... are insufficient to sustain a jury's verdict.").

7   **B.   Meyst's Infringement Opinions Are Conclusory and Not Based on**
8        **Sufficient Facts or Data.**

9        Courts will "not accord weight to conclusory expert testimony." *cxLoyalty*,

10  986 F.3d at 1378. And Puffco has the burden of establishing Meyst's opinions are

11  "based upon sufficient facts or data." But Meyst offers little more than "Because I

12  say so." At bottom, several of Meyst's opinions are what the Supreme Court called,

13  "subjective belief or unsupported speculation . . . ." *Daubert*, 509 U.S. at 590.

14  Specifically, Meyst's opinion regarding infringement is conclusory. He baldly

15  states: "The Kandypens' Oura and the Puffco Peak operate in the same fashion."

16  (Meyst Report ¶36.) But at his deposition, Meyst admitted he performed no

17  experiments. He admitted he merely "turned the units on. I looked at the Quick

18  Start guides which explain how to operate them, so I did that. Never put anything to

19  vaporize in it." (R. Meyst Dep. (7/20/21) at 31:13-18.) Instead, of experiments, he

20  improperly compared the Oura directly to the Peak instead of the '344 Patent. (*Id*.

21  at 67:25-69:21.) When asked why, he stated: "I'm entitled to do whatever I want."

22  (*Id*.)

23      But Meyst is not entitled to do whatever he wants. He must follow a reliable,

24  legally permissible methodology. And under well-established Federal Circuit

25  precedent, it is error to conduct an infringement analysis by comparing the accused

26  product to a commercial embodiment of the patent. Instead, the accused product

27  must be compared directly to the patent claims. *See* Part III.D, *infra*.

28

Finally, on his POSITA opinion, at his deposition, he conceded that his opinion "is based on ***my general feeling*** . . . ." (R. Meyst Dep. (7/20/21) at 34:5-13 (emphasis added).) He pointed to no facts underlying his opinion—other than his knowledge of one Puffco employee (whom he initially could not name).

These conclusory statements are "not accord[ed] weight . . . ." *cxLoyalty*, 986 F.3d at 1378. Notably, this is not the first time Meyst has relied on conclusory statements—once even in front of this Court. In an e-cigarette patent infringement case, this Court rejected Meyst's unfounded conclusory opinions because he claimed alternatives existed for the invention and that the inventor was in possession of other configurations or materials to achieve the same result. *Fontem Ventures, B.V. v. NJOY, Inc.*, No. CV 14-1645-GW(MRWX), 2015 WL 12720306, at *7 (C.D. Cal. Oct. 22, 2015). But Meyst did not identify any of the other alternatives he claimed existed, or how the inventor was in possession of other configurations or materials. *Id*. The Court did not consider the opinion on summary judgment. *Id*. Meyst's testimony was again rejected by a district court for lacking explanation in *Junker v. Med. Components, Inc.*, No. CV 13-4606, 2019 WL 109385, at *7 (E.D. Pa. Jan. 4, 2019). There, Meyst baldly concluded that Plaintiff's invention had "a curved line representing a scallop." *Id*. That court granted summary judgment over Meyst's conclusory opinion. *Id*. at *8.

The same should hold here and the Court should exclude Meyst's conclusory and unsupported assertions.

## C. Meyst's Second Container Outlet Opinion Lacks a Sufficient Factual Foundation.

Even if not deemed conclusory, Meyst's opinion regarding what he calls the "second container outlets of the Oura" lacks sufficient foundation and cannot be reliable. The reason is simple—Meyst conceded that the alleged "second container outlets" are not actually "outlets" at all. (R. Meyst Dep. (7/20/21) at 85:15-86:24

Keesmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

11

Keresmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

("Okay. It is outside the container."); *see also id.* at 100:2-17, 95:23-96:16.) He also conceded that the location of the disputed outlets are a question that does not require his expertise to resolve. (*Id.* at 122:12-123:5.)

Accordingly, due to Meyst's unexplained contradiction and the lack of need for expert opinion of the matter, (1) the testimony is ***not*** based upon sufficient facts or data, (2) the testimony is ***not*** the product of reliable principles and methods, and (3) the witness has ***not*** applied the principles and methods reliably to the facts of the case.

### D.   Meyst Improperly Compares the Oura to the Peak Rather than the Patent.

"Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985); *see also EcoServices, LLC v. Certified Aviation Servs., LLC*, 312 F. Supp. 3d 830, 836 (C.D. Cal. 2018) (A determination whether an accused product literally infringes a patent's claims, "'requires a comparison of the properly construed claim to the accused device.'") (quoting *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004)); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed. Cir. 1985) ("As a threshold matter, the district court compared PC504 with Loctite's commercial embodiment, and that is error."), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998); *Teledyne McCormick Selph v. United States*, 558 F.2d 1000, 1007 (Ct. Cl. 1977) (describing a plaintiff's attempt to prove infringement by comparison of the accused product to its own device as "folly"); *Tektronix, Inc. v. United States*, 179 U.S.P.Q. 703 (Ct. Cl. 1973) ("[P]laintiff's right to compensation [for patent infringement] is ultimately dependent on a comparison

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

between a commercial device and the claims of the patent, not on a comparison of two commercial devices.").

This is particularly important in a case like this where the patentee's commercial embodiment—the Puffco Peak—is only established as practicing the patent because KandyPens has admitted Puffco's allegations to that effect for judicial convenience. Though KandyPens has not attempted to analyze the issue, it may well be the case that the Peak lacks "second container outlets" under the Court's construction. But the issue is never whether how similar the Oura's features are to the Peak's, but how the Oura's features compare to "the properly and previously construed claims in suit."

Accordingly, infringement determinations on the basis of comparing the accused product to a patentee's commercial embodiment of an invention is prohibited. *EcoServices*, 312 F. Supp. 3d at 838. Indeed, in *EcoServices* the court granted the motion to exclude an expert's opinion on the ground that the expert's reliance on the commercial embodiment was unreliable and misleading to a jury. *Id*. at 839.

Meyst cannot prove infringement any other way. In his Report, Meyst baldly states: "The second container outlets of the Oura are designed exactly as described in one embodiment of the '334 Patent . . . ." (Meyst Report ¶ 89; *see also id.* ¶ 49.) Even though he later conceded that the Oura's slits are not the "apertures or openings through which gas leaves the container," his central rationale is that he is right because he is right: "I think it's clear in my report that I say that the Kandypens product does have second container outlets." (R. Meyst Dep. (7/20/21) at 75:8-15.) When asked why he reached that conclusion, he curtly answered: "Because it does." (*Id*.) When further challenged on the point, he testified, "Well, this is my opinion. . . . And I believe this is a fact of how the thing operates." (*Id*. at 81:1-19.) Other than bald declarations, Meyst never pointed to any facts

underpinning the opinion that "[t]he second container outlets of the Oura are designed exactly as described in one embodiment of the '334 Patent…," which again, is not a comparison to "the properly and previously construed claims in suit." *See SRI Int'l*, 775 F.2d at 1121.

Meyst's insistence on comparing the Oura to the Peak and an embodiment described in the patent is unreliable and contrary to governing law. The Court should exclude it.

### E.   Meyst Invades the Province of the Jury.

Compounding the problems with Meyst comparing the Oura to a patentee's commercial embodiment, he justified his decision based on ***factual determinations*** rather than ***expert analysis***. "The court, in its role as gatekeeper, must exclude expert testimony . . . which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions." *Sundance*, 550 F.3d at 1364. Here, Meyst attempted to fulfill that role by looking at facts and deciding that the Oura was a direct copy of the Peak.

He admits as much: "And, in fact, I believe a Peak device was shipped to a manufacturer in China and said, this is what we are doing with the additional changes." (R. Meyst Dep. (7/20/21) at 67:25-69:21.) Later he testified, "I believed - - I saw emails back and forth between Kandypens and the Chinese manufacturers where they shipped a -- a Peak unit and said here it is and then these are the changes we want." (*Id.* at 115:16-116:15.) When asked what made him an expert on copying, he made an observation that any layperson could make: "Well, one example would be when I have the two atomizers in my hand, unless I look at the details, they are almost identical." (*Id.* at 116:8-15.)

Meyst's opinions on direct copying should be excluded—and given that this opinion formed the basis for infringement, that opinion should be excluded as well.

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

1    Similarly, Meyst admitted that his opinion regarding "second container

2    outlets" (one which should be excluded for the reasons stated above) is partially

3    based on his interpretation of the testimony of Graham Gibson. (*See* R. Meyst Dep.

4    (7/20/21) at 92:2-95:22.) Meyst testified that because Gibson called openings

5    "slits," it somehow means his opinion on "second container outlets" is correct.[2]

6    Meyst was then asked, "The issue is whether or not those are, in fact, the apertures

7    through which gas leaves the container; isn't that right?" He answered: "I believe

8    that's correct." (*Id*. at 96:11-16.) In other words, Gibson did not support Meyst's

9    opinion—Meyst invaded the province of the jury by interpreting facts. Indeed, at

10   the conclusion of his deposition, Meyst conceded that the jury did not need his

11   expert opinion to make its determination regarding the second container outlets. (*Id*.

12   at 122:12-123:5.)

13   Even if not excluded on the grounds stated above, Meyst's opinions

14   regarding the second container outlets should be excluded as invading the province

15   of the jury.

16   **F.     Meyst's Opinions Regarding a POSITA Are Unreliable.**

17   In Daubert, the Supreme Court held, "the word 'knowledge' connotes ***more***

18   ***than subjective belief or unsupported speculation***. . . . Proposed testimony must be

19   supported by appropriate validation—i.e., 'good grounds,' based on what is

20   known." *Daubert*, 509 U.S. at 590 (emphasis added). Meyst's opinion regarding a

21   POSITA cannot meet this test and should be excluded.

22   Meyst admitted he focused mainly on one Puffco employee: "Well, my

23   knowledge is limited, but I understand that the gentleman at Puffco, which is who I

24   have at least been aware of, he was -- had a design or bachelor's degree, I believe,

25   in industrial design and has been working in the field for a number of years." (R.

26   Meyst Dep. (7/20/21) at 40:3-16.) He could not remember the man's name but

---

27   [2] In the testimony referenced by Meyst, Gibson did no more than acknowledge that gas
     enters the slits *after* it leaves the container. (R. Meyst Dep. (7/20/21) at 93:93:12-20
28   (Meyst reading the deposition excerpt he contends supports his opinion).)

agreed when asked about Avi Bajpai. (*Id*.) In declaring that one would need experience on the product at issue to be a POSITA, Meyst excluded himself as a POSITA. (*Id*. at 60:2-10.)

Furthermore, Meyst could not explain why he provided a different definition of a POSITA in this case than he had as an expert for an e-cigarette case several years prior: "Well, I think it's an opinion that you develop and it may change over time. It's not an absolute, so this is an approximation of what would be required and very -- very well the same person could look at the same information and come up with a different result." (*Id*. at 61:6-15.) In fact, on the differences in his opinion, he conceded, "I hadn't thought about it." (*Id*. at 62:20-63:6.)

Rule 702 of the Federal Rules of Evidence requires: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Meyst's POSITA opinion cannot meet this test.

## IV.   CONCLUSION

For his infringement opinions, Meyst relies on his own say so (when asked why he believes the Oura works the way he says, he answered: "Because it does." (*Id*. at 75:8-15).) He relied on inferences and assumptions he made—conclusions only a jury could reach. And he relied on limited information to the exclusion of information he deemed inconvenient.

The Court should exclude Meyst's opinions regarding second container outlets, direct copying, and POSITA.

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

1

DATED this 18th day of August 2021,

2

3

KERCSMAR FELTUS & COLLINS PLLC

4

By: *s/ Sean J. O'Hara*

5

Sean J. O'Hara
7150 East Camelback, Suite 285

6

Phoenix, Arizona 85251

7

8

Eric B. Hull
100 Wilshire Boulevard, Seventh Floor

9

Santa Monica, California 90401

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

17