Eric B. Hull (# 291167)
ebh@kfcfirm.com
KERCSMAR FELTUS & COLLINS PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90211
Telephone: (310) 928-7885
Facsimile: (480) 421-1002

Sean J. O'Hara *(Admitted Pro Hac Vice)*
sjo@kfcfirm.com
KERCSMAR FELTUS & COLLINS PLLC
7150 East Camelback Road, Suite 285
Scottsdale, Arizona 85251
Telephone: (480) 421-1001
Facsimile: (480) 421-1002

*Attorneys for KandyPens Inc.*

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| Kandypens, Inc., a Delaware corporation,<br><br>Plaintiff,<br><br>v.<br><br>Puff Corp., a Delaware corporation,<br><br>Defendant. | Case No. 2:20-cv-00358-GW-KS<br><br>**KANDYPENS, INC.'S OPPOSITION TO PUFFCO'S MOTION FOR PARTIAL SUMMARY JUDGMENT** |
| Puff Corp., a Delaware corporation,<br><br>Counterclaimant,<br><br>v.<br><br>Kandypens, Inc., a Delaware corporation,<br><br>Counterdefendant. | District Judge: George H. Wu<br>Date: October 7, 2021<br>Time: 8:30 a.m.<br>Place: Courtroom 9D, Ninth Floor<br>350 West 1st Street<br>Los Angeles, CA 90012<br>Action Filed: January 13, 2020<br>Trial Date: December 14, 2021 |

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

# TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. FACTS .......... 2

A. Puffco Commercially Launches the Peak More than One Year Before Applying for a Patent .......... 2

B. KandyPens Introduces a Differently Designed Competitor, the Oura .......... 4

C. Puffco's Changes Its Invalidity Defenses As They Prove Untenable .......... 4

D. Puffco Stubbornly Insists That An Outlet Does Not Need To Be An "Outlet." .......... 8

III. LEGAL ARGUMENT .......... 11

A. Summary Judgment Standard .......... 11

B. Puffco's Promotional Efforts at Pepcom Were Public Use .......... 11

C. The Pepcom Units Practiced Every Limitation Of The '334 Patent .......... 13

D. Press Coverage Of Pepcom Disclosed All Limitations Of The '334 Patent .......... 14

E. The Oura Does Not Infringe Any Claim Of The '334 Patent .......... 16

IV. CONCLUSION .......... 20

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

11-cv-5341 YGR,
2014 WL 971765 (N.D. Cal. Mar. 5, 2014) ... 19

700 F.3d 1314 (Fed. Cir. 2012) ... 15

*Adenta GmbH v. OrthoArm, Inc.*,
501 F.3d 1364 (Fed. Cir. 2007) ... 12

*ArcelorMittal France v. AK Steel Corp.*,
811 F. Supp. 2d 960 (D. Del. 2011) ... 15

*Briggs & Stratton Corp. v. Chongqin RATO Power Co.*,
2015 WL 4603553 (N.D.N.Y. July 30, 2015) ... 12, 13

*Dayco Prod., Inc. v. Total Containment, Inc.*,
329 F.3d 1358 (Fed. Cir. 2003) ... 15

*EcoServices, LLC v. Certified Aviation Servs., LLC*,
312 F. Supp. 3d 830 (C.D. Cal. 2018) ... 16

*EMC Corp. v. Pure Storage, Inc.*,
2016 WL 775742 (D. Del. Feb. 25, 2016) ... 16

*FMC Corp. v. F.E. Myers & Bro. Co.*,
384 F.2d 4 (6th Cir. 1967) ... 12

*In re Epstein*,
32 F.3d 1559 (Fed. Cir. 1994) ... 12, 13

*Janssen Pharmaceutia, N.V. v. Eon Labs Mfg., Inc.*,
134 F. App'x 425 (Fed. Cir. 2005) ... 13

*Lockwood v. Am. Airlines, Inc.*,
1995 WL 822659 (S.D. Cal. Nov. 14, 1995) ... 12

*Loctite Corp. v. Ultraseal Ltd.*,
781 F.2d 861 (Fed. Cir. 1985) ... 16

*Manganella v. Evanston Ins. Co.*,
702 F.3d 68 (1st Cir. 2012) ... 11

*Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*,
424 F.3d 1347 (Fed. Cir. 2005) ... 15

*Perricon v. Medicis Pharm. Corp.*,
432 F.3d 1368 (Fed. Cir. 2005) ... 15

*Petrolite Corp. v. Baker Hughes Inc.*,
96 F.3d 1423 (Fed. Cir. 1996) ... 12

*Polara Eng'g Inc. v. Campbell Co.*,
894 F.3d 1339 (Fed. Cir. 2018) ... 12

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
378 F.3d 1396 (Fed. Cir. 2004) ... 16

*Reeves v. Sanderson Plumbing Prods., Inc.*,
530 U.S. 133 (2000) ... 11

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107 (Fed. Cir. 1985) ....... 16

*Tekoh v. County of Los Angeles*, 270 F. Supp. 3d 1163 (C.D. Cal. 2017) ....... 11

*Tektronix, Inc. v. United States*, 179 U.S.P.Q. 703 (Ct. Cl. 1973) ....... 16

*Teledyne McCormick Selph v. United States*, 558 F.2d 1000 (Ct. Cl. 1977) ....... 16

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540 (Fed. Cir. 1983) ....... 13

Statutes

35 U.S.C. § 102(a) (1), (b)(1)(A) ....... 11

Other Authorities

U.S. Patent No. 10,517,334 ....... 3

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

# I. INTRODUCTION

Puffco's motion for partial summary judgment relies on speculative, uncorroborated testimony and misapprehensions of controlling law and this Court's claim construction. Under any reasonable interpretation of patent law and applying the appropriate summary judgment standard, there exists—at a minimum—genuine disputes of material fact precluding summary judgment for Puffco on any issue in the case. Indeed, even when the facts are viewed in the light most favorable to Puffco, no reasonable fact-finder could determine that the '334 Patent is valid or that the Oura infringes. [KandyPens' Motion for Summary Judgment, Dkt. #128.] But for present purposes, it is enough that Puffco cannot meet its burden to prevail on this motion.

Puffco's contention that its promotional activities at Pepcom in early-January 2018 are not invalidating public uses relies on a gross misreading of the law. While there are certain scenarios where experimental use of an invention outside of the lab will not count as public use, none of those limited exceptions apply to wholly commercial, and wholly non-confidential, public use and demonstration at a trade show with journalists. More than that, the press coverage of these demonstrations resulted in printed publications that anticipate every single claim limitation of the '334 Patent.

Similarly, Puffco's insistence that the demonstration units' atomizers were not removably attachable is unsupportable on summary judgment. For one thing, the claim that the atomizers were not removable is a relatively recent creation, coming only after Puffco had twice admitted that the Pepcom units had removably attachable atomizers. For another, even if the fact-finder were to indulge Puffco's witnesses' self-serving speculation that the atomizers had soldered connections, the atomizers would still be removably attachable under the Court's construction of that term.

Puffco's infringement case is no better. Indeed, by filing a motion for reconsideration of the claim construction ruling [Dkt. #130], Puffco has implicitly conceded that the Oura does not infringe under the current construction of "second container outlets." KandyPens will address the numerous substantive and procedural defects in that motion in a forthcoming opposition, but suffice to say, the Court correctly construed "second container outlets" and under the construction, Puffco cannot demonstrate that the Oura infringes the '334 Patent.

Puffco's motion for partial summary judgment should be denied in full.

## II. FACTS[1]

### A. Puffco Commercially Launches the Peak More than One Year Before Applying for a Patent.

On January 8, 2018, Puffco was ready for the commercial launch of its Peak portable electronic vaporizer. The Peak would be shown to the world at an event called Pepcom, held the night before the larger Consumer Electronics Show in Las Vegas. To circumvent Pepcom's prohibition against using cannabis, Puffco planned for a "Puffco Peak Lounge" or "Puffco Peak Suite" where Puffco could demonstrate the Peak for journalists and journalists could try the Peak themselves. (KandyPens' Statement of Genuine Disputes ("SGD") ¶ 57.)

Though the first units would not be shipped to customers until a few weeks later, the Peak was ready for media and consumer scrutiny. The design of the Peak was complete, and the units brought to Pepcom were visually indistinguishable from the final product. Of particular importance to the instant motion, the atomizer design was largely finalized months earlier in September 2017. Beyond the atomizer, none of the Puffco personnel involved in the Peak's development are

[1] In addition to the facts set out in Part II that show, at a minimum, genuine disputes preventing summary judgment in any part for Puffco, KandyPens incorporates by reference the facts set out in its own Motion for Summary Judgment [Dkt. #128] and Statement of Undisputed Material Facts [Dkt. #133-1] to the extent they are relevant to any issue raised by Puffco's motion.





Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

able to identify a single material difference between the Peaks used at Pepcom and those that were shipped to consumers in February 2018. (SGD ¶¶ 57-61.)

Pepcom was a huge success for Puffco, drawing fawning coverage from Engadget, a news outlet that is a personal favorite of Puffco's CEO, Roger Volodarsky. One Engadget reporter filmed himself using the Peak on the floor of Pepcom while Volodarsky stood nearby, then uploaded the video to YouTube that same day. (SGD ¶ 62.) Another Engadget reporter was invited to the Puffco Peak Suite and wrote about how "Volodarsky was showing off the Puffco Peak," and "how it truly works." (*Id.*) According to Volodarsky, he conducted multiple demonstrations in the hotel suite, with journalists trying out the Peak for themselves. (SGD ¶ 57.) Make no mistake—other than the limited purpose of keeping the hotel's management ignorant of their cannabis use until after Puffco checked out—there was nothing "confidential" about these demonstrations. They were purely promotional in nature, and when the demonstrations had their desired effect of publicity, Volodarsky was "honored," not upset about any supposed breach of confidentiality. (SGD ¶ 62.) Nor were these demonstrations experimental or tests of any sort—Puffco's motion asserts no evidence of such a purpose, or that any feedback was provided after the fact. Nor would anyone expect there to be; the Peak was complete and ready for shipping to customers just a few weeks later. (SGD ¶¶ 57-61.)

Despite the commercial launch of the Peak on January 8, 2018 and Puffco's extensive publicity efforts showing off all aspects of the Peak in the ensuing week, Puffco waited until January 14, 2019 to apply for patent protection. To circumvent the one-year bar, Puffco's submissions to the Patent Office did not say anything about its public demonstrations or include any news coverage of the early-January 2018 promotional efforts. Ignorant of this invalidating prior art, the Patent Office issued Puffco U.S. Patent No. 10,517,334 on December 31, 2019. (SGD ¶ 63.)

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

**B. KandyPens Introduces a Differently Designed Competitor, the Oura.**

Meanwhile, distributors in the vaporizer industry noticed not just the success of the Peak, but its reputation for technical problems and customers' frustration with Puffco's customer service. Some distributors looked to KandyPens, one of Puffco's competitors, to come out with a product with similar functionality but without the reliability issues. So, KandyPens set about designing a device that would be better than the Peak—what would become the KandyPens Oura. In particular, KandyPens made special effort to design the Oura's glass and atomizer to be differently configured than the Peak's. (SGD ¶ 4.)

**C. Puffco's Changes Its Invalidity Defenses as They Prove Untenable.**

Even though the Oura's success in the market was modest compared to the Peak's, Puffco wasted no time in wielding its new patent against KandyPens, sending a cease-and-desist letter on January 3, 2020. This lawsuit for a declaratory judgment on invalidity followed, and so did Puffco's counterclaim for infringement.

Early discovery in this case focused on Puffco's invalidating public use of the Peak before January 14, 2018 and the printed publications before that date revealing all features of the Peak. Puffco's initial strategy to rebut these allegations was to plead ignorance—claim the prototypes were destroyed shortly after Pepcom, and profess wholesale lack of knowledge as to what attributes the Peaks demonstrated at Pepcom had beyond those visible from press coverage, while speculating that underneath their visually indistinguishable exteriors, the demonstration Peaks could have any number of unidentified differences from the production model. Still, Puffco twice admitted that the Peaks used by journalists at Pepcom had "removably attachable" atomizers. But on June 1, 2020, Puffco abruptly changed its story, withdrawing its admissions regarding removably attachable atomizers and instead claiming it could neither admit nor deny the

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

presence of removably attachable atomizers in the demonstration Peaks. The only explanation proffered by Puffco was:

> Puffco believes that the prototype may not have had an atomizer that was removably attachable to the base. Puffco created various Peak prototypes that did not have had [sic] an atomizer that was removably attachable to the base. During the development of the Peak and leading up to the 2018 Pepcom event, the Peak prototype atomizers were having various connection problems, and thus, Puffco's prototype for the 2018 Pepcom event may not have had an atomizer that was removably attachable to the base.

(SGD ¶ 47.) Puffco waited nearly a year longer before it would disclose any discovery explaining what it was about those atomizers that rendered them not removably attachable:

> Q Okay. What was different about those Pepcom prototypes and the Peak that's sitting there in front of you?
>
> A It's hard to say. Like I mentioned, we make hundreds of prototypes. We take them apart. We put them together, take them apart, add components, learn from them. So without those prototypes sitting in front of me, I really can't tell you exactly what's in them.
>
> Q Okay. Generally, can you tell me any of the differences?
>
> A Generally, I can't. I would say when we are doing any demos, especially when the product is not finished, it's a very nerve racking experience, and you try to remove as much as risk as possible. So if we were having any issues with the prototypes, which we -- which we clearly were, for example, a connection issue, we would try to eliminate that risk so that the demo went smoothly by hardwiring the atomizer or changing the connection in some way.

(*Id.*) Elsewhere in that deposition, the witness explained that he couldn't quite remember how the "hardwiring" was achieved:

> Q Okay. How would you hardwire an atomizer?

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

A There's several ways. The easiest way would be to solder a wire to this pin in the bottom and fish that into the base and attach it directly to the [printed circuit board].

Q I'm sorry. Can you please describe that again?

A Sure. So one of the main connection issues that we would have is the contact between these two gold electrodes, the center electrodes. So in order to hardwire it, what we would do is attach a wire to the bottom of this electrode. So we would solder a wire on to here. We would remove the electrode that's in the base. We would fish that wire into the base and solder it directly to the PCB.

Q How would you solder it to the PCB? While it was still inside the base?

A No. This would be during the assembly process.

Q Okay. So really, it would be backwards. You'd solder it to the PCB, and then have it go out through the –

A You could do it either way.

Q Okay. How did you do it?

A I don't specifically remember exactly how we did it. I have reviewed some documents, and there's some images of us actually pulling the wires just out the side here and attaching those directly to a power supply, but I don't remember specifically how I would do it, but overall, that's how. Whether we attached it to the PCB first or the atomizer first, I'm not sure.

(*Id.*) The Puffco engineer with primary design responsibility for the atomizer described it differently:

Q I believe you testified earlier that the primary way you would hardwire an atomizer during Peak development would be to solder the wire to the electrode on the bottom of the atomizers. Is that a fair summary?

MR. CROWE: Object to the form of the question.

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

> THE WITNESS: When I would hardwire them, I would take the two wires from the circuit board, and I would put one on the electrode and one on the housing.
>
> ...
>
> Q Okay. Are there any other ways you hardwired a Peak's atomizer other than soldering it to the electrode and the housing as you just described?
>
> MR. CROWE: Object to the form of the question.
>
> THE WITNESS: Not that I recall.

(*Id.*) Regardless of how Puffco claims it supposedly "hardwired" atomizers for Pepcom, Puffco has not produced a single document referring to hardwiring an atomizer, and the only photographic or video evidence of anything approaching "hardwiring" is a video of a Peak that has obvious external wires leading to an external power source—something that obviously was not present on the Pepcom Peaks.

Shortly after these mid-May 2021 depositions, KandyPens disclosed the expert report of Dr. Jeff Colwell on June 4, 2021, who demonstrated that an Peak's atomizer with an internal soldered connection would still be "capable of being detached from the base and reattached or replaced with an identical piece" because the atomizer's soldered connection can be severed and reconnected. (*Id.*) With yet another attempt to dodge the consequences of its invalidating public use, Puffco has now filed a separate motion (Motion to Exclude Jeff D. Colwell from Providing Expert Testimony [Dkt. #127]) that belatedly asks the Court to re-construe this term to impose all manner of limitations not included in the patent (*e.g.*, removability and reattachability easily accomplished by a consumer without tools) despite the fact that the Court has already considered and rejected this same argument. (Claim Construction Order [Dkt. #76] at 5-6.)

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Previously, KandyPens pointed out the absence of anything in the patent referring to an "ordinary consumer" or even suggesting that the patent's scope was limited to "consumer devices." (KandyPens' Opening Claim Construction Brief [Dkt. #65] at 11-12.) Puffco's only counterargument was to point to expressly non-exclusive embodiments in the specification as reflecting "simple and routine removable and/or re-attachment of these components" by the end-user (Puffco's Opening Claim Construction Brief [Dkt. #66] at 13; *see also* Puffco's Responsive Claim Construction Brief [Dkt. #68] at 10 ("A POSITA would understand the ordinary consumer of the device to be the end user of the device, meaning the person who operates the device for personal enjoyment and use thereof, as opposed to a device designer or a repair technician."). After receiving a Tentative Ruling rejecting Puffco's effort to impose a "as part of ordinary consumer device operation" limitation on the term "removably attachable," Puffco asserted its backup position that these tasks must still be accomplished by "the user" because certain embodiments described in the specification involve "the user" performing the task. (Reporter's Tr. of Markman Hearing [Dkt. #86] at 5:20-6:18.) But after KandyPens pointed out that these embodiments are expressly non-limiting, the Court again rejected Puffco's effort to limit the claim construction to something accomplished by a "user." (*Id.* at 6:19-8:6.)

**D. Puffco Stubbornly Insists that an Outlet Does Not Need to Be an "Outlet."**

At the same time discovery was zeroing in on the lack of any verifiable differences between the Peaks used at Pepcom and the retail Peaks, KandyPens was making its primary noninfringement theory clear—the Oura doesn't have "second container outlets" as that term is used in the patent. In a July 6, 2020 interrogatory response setting out its noninfringement position in response to Puffco's infringement contentions claiming that the "slits" in the ring above the Oura's container were "second container outlets," KandyPens said:

| | |
|---|---|
| one or more second container outlets capable of flowing the gas having the vaporizable product entrained therein into atomizer internal flow path; and | Disagree. The Oura's container has only one opening: the absent top plane of the cylinder. The single opening in the Oura container cannot be reasonably construed as the distinct claim elements of a first container inlet and a second container outlet. Furthermore, it is unclear what structure might be first container outlet to cause second container outlet to be numbered second. Therefore, this claim element does not read on the Oura. |

(SGD ¶ 20.)

With the parties' respective positions on "second container outlets" made clear, the parties proceeded to claim construction. Recognizing that the geometry of the Oura is such that gas leaves the container before it enters the slits in the atomizer ring, Puffco pressed for "apertures or openings that *serve as* an outlet for the container, and that are separate from the first container inlet." (Puffco's Opening Claim Construction Brief [Dkt #66] at 19-22 (*emphasis added*).) KandyPens noted the unjustified overbreadth introduced by the modifier "serve as," and demonstrated that the '334 Patent itself requires true outlets, that is, openings through which gas actually exits the container. (KandyPens' Opening Claim Construction Brief [Dkt. #65] at 16-19; KandyPens Responsive Claim Construction Brief [Dkt. #69] at 8-10.) And when Puffco made the same argument it makes here—"Kandypens' proposed construction differs from Puffco in requiring that apertures be ***of*** the container … as opposed to Puffco's proposed construction that the apertures or openings serve as an outlet ***for*** the container [Dkt. #66 at 19 (emphasis in original)]—KandyPens showed that the patent still required the outlets be apertures through which gas leaves the container even though there are several possible embodiments of the claims where the apertures are not found in the body of the container:

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885




"one or more apertures formed between a top surface of the container and an annular ring disposed above the container, the annular ring comprising one or more indentations formed in a bottom surface about a circumference thereof that form the one or more apertures between the bottom surface of the annular ring and the top surface of the container"



"one or more apertures formed about a circumference of an annular ring disposed above the container"

[Dkt. #69 at 9-11.] Puffco, meanwhile, continued to urge a looser definition to capture openings that gas can pass through after leaving the container: "[T]o 'serve' as outlets it is understood simply that the apertures or openings are capable of allowing gas to flow out of the container." [Puffco's Responsive Claim Construction Brief [Dkt. #68] at 19.] The Court acknowledged that the openings need not be formed in the body of the container itself but rejected Puffco's repeated efforts to broaden the construction to not require literal outlets, giving the term the construction, "apertures or openings through which gas leaves the container, and that are separate from the first container inlet and may be separate from the body of the container." [Dkt. #76 at 8.]

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

## III. LEGAL ARGUMENT

### A. Summary Judgment Standard

Though the Court is well-acquainted with the standard for summary judgment, it bears repeating that if there are competing reasonable inferences to be drawn, all such inferences must be drawn in KandyPens' favor. *See, e.g., Tekoh v. County of Los Angeles*, 270 F. Supp. 3d 1163, 1168 (C.D. Cal. 2017). The Court can also only consider admissible evidence, such that conclusory and speculative evidence is accorded no weight. *Id.* Similarly, when considering whether a dispute is "genuine" or not, the Court must recognize the possibility that the moving party's self-serving testimony may be given no weight at all by the fact-finder because the fact-finder need not credit such testimony. *Manganella v. Evanston Ins. Co.*, 702 F.3d 68, 74-75 (1st Cir. 2012); *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) ("[T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'") (Quoting 9A C. Wright & A. Miller, Fed. Prac. & Pro. § 2529 at 300 (2d ed. 1995)).

### B. Puffco's Promotional Efforts at Pepcom Were Public Use.

While there are many reasons that the '334 Patent is invalid, the simplest is that Puffco publicly used and displayed the Peak more than one year before it applied for a patent. Inventors are allowed a one-year grace period to publicly use and sell their inventions before applying for patent protection; if an inventor waits more than a year after a public use, sale, or other public display of the invention, the public use becomes disqualifying prior art. *See* 35 U.S.C. § 102(a)(1), (b)(1)(A).

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

"Any non-secret use of a completed and operative invention, in its natural and intended way, open to the public, is a public use." *Lockwood v. Am. Airlines, Inc.*, No. CIV. 91-1640-E(CM), 1995 WL 822659 at *2 (S.D. Cal. Nov. 14, 1995), *aff'd*, 107 F.3d 1565 (Fed. Cir. 1997) (citing *FMC Corp. v. F.E. Myers & Bro. Co.*, 384 F.2d 4, 9 (6th Cir. 1967)). In contrast to printed publication prior art, public use, public display, and sales do not need to be "enabling"; in other words, the public need not see every feature of the invention or understand how it works. *In re Epstein*, 32 F.3d 1559, 1568 (Fed. Cir. 1994); *see also Briggs & Stratton Corp. v. Chongqin RATO Power Co.*, No. 5:13-cv-0316, 2015 WL 4603553, at *4 (N.D.N.Y. July 30, 2015) (noting that invalidity due to public use is a two part inquiry: (1) was there a public use, and (2) did the product used in public contain every limitation of the patent).

"Public use includes 'any use of the [the claimed] invention by a person other than the inventor who is under no limitation, restriction or obligation of secrecy to the inventor.'" *Id.* (quoting *Petrolite Corp. v. Baker Hughes Inc.*, 96 F.3d 1423, 1425 (Fed. Cir. 1996)). Public use also includes displaying a product at a trade show. *Adenta GmbH v. OrthoArm, Inc.*, 501 F.3d 1364, 1371 (Fed. Cir. 2007).

The only time use of an invention in public or by someone other than the inventor is not invalidating public use is when those using or viewing the invention have agreed to keep it a secret against the rest of the world, or when the nature of the invention is such that it cannot be tested except in public and the public remains ignorant of the invention. *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339, 1348-48 (Fed. Cir. 2018). Indeed, each of the three cases cited in Puffco's motion for the proposition that alleged public uses must be enabling involve experimental or confidential use. *Dey, L.P. v. Sunovian Pharms., Inc.*, 715, F.3d 1351, 1354 (Fed. Cir. 2012) (alleged public use was a clinical trial of a drug);

*Janssen Pharmaceutia, N.V. v. Eon Labs Mfg., Inc.*, 134 F. App'x 425, 430-31 (Fed. Cir. 2005) (same); *W.L. Gore & Assocs., Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1549-50 (Fed. Cir. 1983) (use of invention was by a user who signed confidentiality agreement, in presence of those who also signed confidentiality agreements).

None of the experimental or confidential use cases approach the brazen promotional public use by Puffco in this case. Puffco does not even allege that its activities at Pepcom were for any purpose other than drawing public attention to the Peak. It was nothing short of a commercial launch, and any suggestion otherwise can't even withstand KandyPens' motion for summary judgment on this issue, let alone require summary judgment for Puffco.

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

**C. The Pepcom Units Practiced Every Limitation of the '334 Patent.**

The second part of the public use inquiry, once the non-secret use is established, is whether the product used in public contained every limitation of the patent. *Briggs & Stratton*, 2015 WL 4603553, at *4; *see also Epstein*, 32 F.3d at 1568 ("Beyond this 'in public use or on sale' finding, there is no requirement for an enablement-type inquiry.").

Given that it is supported only by Puffco's witnesses own speculative and uncorroborated testimony, the Court cannot find that Puffco has established the absence of a genuine dispute on the issue of whether the Pepcom demonstration Peaks differed in any meaningful way from the retail units which admittedly practice every claim of the '334 Patent. This is especially true when, before coming forward with the speculative, self-serving testimony, Puffco twice admitted that the demonstration Peaks had removably attachable atomizers. (SGD ¶ 47.)

Puffco brought two Peak units to Pepcom just a month before shipping Peaks to customers. The Pepcom demonstration units are visually indistinguishable from the units shipped to customers. The only possible difference argued in

Puffco's motion is that instead of connecting the atomizer to the base with a threaded connection, the connection was achieved with soldered wires. (SGD ¶¶ 47, 57-61.) On summary judgment, the Court cannot give Puffco the inference that of the two competing stories Puffco has told about the atomizers at Pepcom, the jury would believe the latter, self-serving, uncorroborated story. But even if it were undisputed that the atomizers had soldered connections, a soldered connection (or even two soldered connections) does not make the atomizer not "removably attachable" under the Court's construction of "capable of being detached from the base and reattached or replaced with an identical piece" because the atomizer can still be detached and reinstalled (or replaced) by cutting or melting the soldered connection and then re-soldering a new connection.[2] Thus, even if the Court were to credit Puffco's new story—and it shouldn't—the Peaks demonstrated at Pepcom still had removably attachable atomizers, and Puffco is not entitled to summary judgment on this issue.

**D. Press Coverage of Pepcom Disclosed All Limitations of the '334 Patent.**

Even if Puffco had been cautious enough to avoid public use of the Peak at Pepcom, the press coverage Puffco successfully obtained resulted in printed publications that disclose every limitation of the '334 Patent. While it is true that none of the prior art references expressly disclose each limitation of the '334 Patent, each reference still discloses all remaining limitations implicitly or inherently. (SGD ¶ 50.)

"[A] prior art reference may anticipate without disclosing a feature of the claimed invention if that missing feature is necessarily present, or inherent, in the

---

[2] In Puffco's Motion to Exclude Jeff D. Colwell [Dkt. #127], Puffco attempts to relitigate the construction of "removably attachable." KandyPens' opposition to that motion, filed contemporaneously with this opposition, addresses the procedural and substantive infirmities of that attempt.





Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

single anticipating reference." *Novo Nordisk Pharms., Inc. v. Bio-Tech. Gen. Corp.*, 424 F.3d 1347, 1355 (Fed. Cir. 2005). "Under the principles of inherency, if the prior art necessarily functions in accordance with, or includes, the claims limitations, it anticipates." *Perricon v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1376 (Fed. Cir. 2005). Implicit disclosure, meanwhile, occurs when one skilled in the art reasonably infers the presence of a limitation from something visible in the reference. *See, e.g., ArcelorMittal France v. AK Steel Corp.*, 811 F. Supp. 2d 960, 967 (D. Del. 2011) (noting that anticipation is assessed in light of what a person of ordinary skill in the art would understand from the reference, including his or her inferences), *rev'd on other grounds*, 700 F.3d 1314, 1322-24 (Fed. Cir. 2012).

In other words, a reference need not spell out or depict every single limitation; it is enough that a person of ordinary skill in the art would recognize the possibility of the limitation in the reference. Rather, "the dispositive question regarding anticipation is whether *one skilled in the art* would reasonably understand or infer from the prior art reference's teaching that every claim element was disclosed in that single reference." *Dayco Prod., Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1368 (Fed. Cir. 2003) (internal citation omitted, cleaned up). Accordingly, while the printed publications do not expressly depict, for example, a "removably attachable atomizer" or an inner "gas flow conduit," the articles, pictures and videos published before January 14, 2018 make clear that those claim limitations necessarily, or at least probably, exist for the Peak to operate. In the context of Puffco's motion for summary judgment, this Court must, at a minimum, find that the fact-finder could credit Gibson's testimony about how each printed publication at issue discloses each limitation of the '334 Patent. The Court must deny summary judgment to Puffco on this issue.

**E. The Oura Does Not Infringe Any Claim of the '334 Patent.**

By spending the bulk of its motion on the supposed copying of the Peak, and the supposed similarities of the Oura to the Peak or embodiments in the '334 Patent's specification, Puffco implicitly concedes that the Oura does not infringe under the infringement analysis mandated by the Federal Circuit. If Puffco believed it could establish infringement under the Federal Circuit's test, it would not have gone to so much effort to misdirect the Court.

"Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit." *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985); *see also EcoServices, LLC v. Certified Aviation Servs., LLC*, 312 F. Supp. 3d 830, 836 (C.D. Cal. 2018) (A determination whether an accused product literally infringes a patent's claims, "'requires a comparison of the properly construed claim to the accused device.'") (quoting *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1406 (Fed. Cir. 2004)); *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed. Cir. 1985) ("As a threshold matter, the district court compared PC504 with Loctite's commercial embodiment, and that is error."), *overruled on other grounds by Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998); *Teledyne McCormick Selph v. United States*, 558 F.2d 1000, 1007 (Ct. Cl. 1977) (describing a plaintiff's attempt to prove infringement by comparison of the accused product to its own device as "folly"); *Tektronix, Inc. v. United States*, 179 U.S.P.Q. 703 (Ct. Cl. 1973) ("[P]laintiff's right to compensation [for patent infringement] is ultimately dependent on a comparison between a commercial device and the claims of the patent, not on a comparison of two commercial devices."). To be clear, it is equally error to compare the Oura to the '334 Patent's figures. *See EMC Corp. v. Pure Storage, Inc.*, No. CV 13-1985-

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

RGA, 2016 WL 775742, at *4 (D. Del. Feb. 25, 2016) ("Suggesting, incorrectly, that literal infringement can be established by comparing accused products with specification or commercial embodiments would risk unfair prejudice….").

Whether the Oura is a "copy" of the Peak, or whether the Oura and the Peak have analogous structures, is completely irrelevant to infringement. Nor is it of any import if there are similarities between the Oura and the patent's figures. Because Puffco relies on nothing more than the flawed analysis of retained expert Richard Meyst (whose testimony should be excluded when the Court grants KandyPens' pending motion on this issue), Puffco has failed to show that the Oura infringes and is not entitled to summary judgment on this issue.

Here, KandyPens is accused of infringing claims 1-11 and 13 of the '334 Patent, all of which require the presence of one or more "second container outlets."[3] This Court has construed the term "second container outlets" to require actual outlets, that is, "apertures or openings through which gas leaves the container, and that are separate from the first container inlet and may be separate from the body of the container."

Puffco's filing of a motion for reconsideration of this construction is an implicit concession that the Oura's slits are not the apertures through which gas leaves the container, and thus, as presently construed, the Oura does not have "second container outlets" and does not infringe any claim of the '334 Patent. As with Puffco's desperate attempt to relitigate the construction of "removably attachable" via its motion to exclude Dr. Colwell, the motion for reconsideration is similarly deficient for a number of procedural and substantive reasons. Those

---

[3] This limitation is found in claim 1, on which claims 2-11 depend. Claim 13 uses the term "container outlets," but Puffco contends that the same slits in the Oura that allegedly constitute "second container outlets" constitute claim 13's "container outlets." The Oura lacks "container outlets" for the same reason it lacks "second container outlets": the slits are not "outlets" of the container at all.

deficiencies will be set out in KandyPens' forthcoming opposition on September 16, 2021. For present purposes, under the present construction, Puffco has failed to show the existence of "second container outlets" and its motion for summary judgment on infringement must fail.

Puffco's efforts to confuse the issue of what "second container outlets" really means are unavailing. First, Puffco tries to draw attention away from the Court's construction of the term "second container outlets" by focusing on the claim's next limitation: "capable of flowing the gas having the vaporizable product entrained therein into the atomizer internal flow path." But as the Court has already ruled, this claim limitation does not define the previous claim limitation of "second container outlets." In order to infringe, the Oura must (1) have "second container outlets," and (2) those "second container outlets" must be "capable of flowing the gas having the vaporizable product entrained therein into the atomizer internal flow path." There is no dispute that the Oura's slits are capable of flowing gas into the atomzier's internal flow path, but that does not render the Oura infringing because it still lacks "apertures or openings through which gas leaves the container." (SGD ¶ 20.)

Second, the final part of the Court's construction of "second container outlets" ("…and may be separate from the body of the container") does not nullify the first part of the construction ("apertures or openings through which gas leaves the container"). Here, Puffco nakedly asserts that "Logically, if the second container outlets are separate from the body of the container, the vapor must have left the container before reaching the second container outlets." (Dkt. #125 at 13:10-12.) But there's nothing about "logic" that compels this finding, as KandyPens already showed in claim construction briefing that there is at least one possible embodiment where the apertures are separate from the body of the container yet still remain true "outlets":

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885



"one or more apertures formed about a circumference of an annular ring disposed above the container"

[Dkt. #69 at 9.] There are many other possible embodiments where the second container outlets are separate from the body of the container and yet remain true outlets. For example, the second container outlets could be hoses that extend down into the container's void. Or the openings in the ring could more subtly overlap the top opening of the container than in the figure above—indeed, that appears to be what is illustrated in Figures 3, 5, 6A, and 6B of the '334 Patent. Regardless, Puffco's insistence that "may be separate from the body of the container" means that gas need not actually leave the container through the openings is contrary to the Court's construction, unsupported by any evidence, and is not compelled by logic.

Finally, Puffco's complaint that Dr. Colwell confined his analysis to the Court's construction of the term "second container outlet' rather than trying to engage in his own claim construction is entirely upside down. Dr. Colwell's acceptance of the Court's construction is what is required of experts, and experts who attempt to contextualize the Court's construction by reference to the patent or extrinsic evidence are not allowed to testify because they are impermissibly engaging in claim construction. *See, e.g., EMC Corp.*, 2016 WL 775742, at *3-4 (granting motion in limine excluding testimony of experts concerning meaning of claim terms based on analysis of embodiments); *MediaTek Inc. v. Freescale Semiconductor, Inc.*, No.: 11-cv-5341 YGR, 2014 WL 971765 (N.D. Cal. Mar. 5, 2014) (granting motion in limine to exclude expert testimony about specification to

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

explain meaning of term not previously identified for claim construction). Put bluntly, Dr. Colwell's refusal to second-guess the Court's construction by referring to other parts of the patent is a feature, not a bug. Puffco's motion for summary judgment on infringement must be denied.

## IV. CONCLUSION

Puffco's arguments are a classic case of desperate times calling for desperate measures. Having reached the end of the case and knowing that KandyPens' invalidity and noninfringmenet positions will inevitably prevail under the Court's claim constructions from November 2020, Puffco filed a fusillade of motions asking this Court to turn Federal Circuit precedent on its head by comparing the Oura to the Peak, and then using those comparisons to re-construe the '334 Patent to (1) render it not anticipated by Puffco's public use of the Peak more than one year before the application and (2) render the Oura infringing due to its similarity to the Peak. But that's not how any of this works.

Substantively, claim construction depends primarily on the language of the patent itself, and the inventors' intent or their alleged commercial embodiments are completely irrelevant. Procedurally, claim construction occurs early in the case following a broad mandatory disclosure regime aimed at preventing sandbagging and promote the early resolution of patent cases. The Court can revisit the ruling, of course, but only when a party demonstrates entitlement to reconsideration under the Local Rules' standards for motions for reconsideration and the Patent Local Rules' standards for modifying the schedule for claim construction. In none of its pending motions did Puffco attempt such a showing, and for good reason—Puffco isn't bringing anything new to the table. Puffco is just rehashing arguments already rejected by the Court, supported by evidence that's been in Puffco's control for a long time. Puffco's decision to wait until after the close of discovery and the

Kercsmar Feltus & Collins PLLC
8200 Wilshire Boulevard, Suite 222
Beverly Hills, California 90401
(310) 928-7885

deadline for filing dispositive motions to seek reconsideration of the claim construction rulings reveals its desperation.

As set out in KandyPens' motion for summary judgment, the facts here are so one-sided that the Court should enter judgment in favor of KandyPens on all claims. But at a minimum, Puffco is not entitled to summary judgment on any issue raised in its motion, and it should be denied in full.

DATED this 8th day of September 2021,

KERCSMAR FELTUS & COLLINS PLLC

By: *s/ Sean J. O'Hara*
Sean J. O'Hara
7150 East Camelback, Suite 285
Phoenix, Arizona 85251

Eric B. Hull
100 Wilshire Boulevard, Seventh Floor
Santa Monica, California 90401